Filed 7/25/14  P. v. Fox CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C073649 |
| Plaintiff and Respondent, | (Super. Ct. No. 12F07830) |
| v. | |
| MICHAEL ALLAHRAE FOX, | |
| Defendant and Appellant. | |

A jury found defendant Michael Allahrae Fox guilty of six offenses committed against his stepdaughter on a single occasion.  (Pen. Code, §§ 243.4, subd. (a)[1] [counts 1, 2, & 5, felony sexual battery by restraint], 243.3, subd. (e)(1) [count 3, misdemeanor sexual battery], 288a, subd. (c)(2)(A) [count 6, felony oral copulation by force or fear],

_____

[1] Undesignated statutory references are to the Penal Code.

1

647.6, subd. (a) [count 4, misdemeanor molestation].)  The trial court sentenced him to 14 years in prison, and he timely appealed.

On appeal, defendant contends: (1) the trial court erred in instructing the jury about a security officer's presence; (2) the trial court improperly admitted evidence of uncharged acts; (3) the trial court erred in denying his motion for mistrial after a witness twice improperly referred to defendant's prison record; (4) insufficient evidence supports the oral copulation count; and (5) the trial court miscalculated his custody credits.  We reject these claims, but agree with the People that the sentence must be modified, including making a conduct credit adjustment adverse to defendant, and imposing and staying a misdemeanor term on one count.  We shall modify the judgment and affirm.

## FACTS

The victim's mother testified she married defendant in 2005, after dating him "off and on" for a couple of years.  She had three children.  The victim was her middle child, having been born in 1996.  The mother met defendant while buying marijuana and used methamphetamine with him.  In 2005, the victim was present when her mother and defendant used drugs.  Defendant was sometimes violent with her, and the victim saw this.  The victim saw him threaten her brother with a knife, and he threatened the victim with a knife twice, once when she was 14 and the once when she was 15.  Defendant threw the victim across the room once, and once tried to hit her in the head with a baseball bat.  When the victim was 14, the mother took the children and hid in the garage one night because defendant said he was going to kill them all.  The victim told her mother she hated defendant and she could do better, but sometimes seemed to get along with him.  More than once, the mother called the police to have defendant arrested.

At one point in 2010 or 2011, the victim called her mother at work and reported that defendant had offered to let her home school "if she let him eat her pussy."  The mother threw defendant out of the house, but eventually let him return when the victim said it was okay, after seeing her mother was "crying all the time."  After that when the

2

mother argued with the victim, the victim was angry that defendant had been allowed back into the home. The weekend after Thanksgiving 2012, the victim called her mother at work, crying, and said defendant had touched her sexually and she was not going back home. The mother went home, saw defendant acting like nothing had happened, except he appeared to be high on methamphetamine, and she called the police. About 20 minutes later, she saw the victim, who was very upset. The mother had two felony convictions for crimes involving moral turpitude, in 1988 and 2005.

The victim testified she was 16 and had known defendant since she was 8. She had seen him smack her mother in the face many times. Once, before the victim turned 16, defendant pushed her mother, causing her to hit her face and cut her eye. Defendant would hit the victim in the mouth, and he would hit her with belts, wires, and other objects if she was being disrespectful or disobedient. He threatened her with a weapon five or six times, and threatened her brother with a kitchen knife. Twice he threatened her life, although without a weapon in hand. She had seen him pull knives, a fork, a screwdriver, and sticks on other people. He was "angry and violent" toward family members, which was "scary." Once he told her they could go into the bathroom with knives and whoever came out alive could have her mother. She often saw him use methamphetamine, and "his lips get all white and dry and cracked, and he gets all jittery."

Just before the victim turned 14, defendant came into her room when she was in her underclothing and asked if she had had sex. When she said she was virgin, defendant asked if she thought about having sex, and asked if he could put his tongue and mouth on her vaginal area, and she told him this made her uncomfortable and she wanted to leave. She told an older friend about this, but was afraid to tell her mother, but after a couple of weeks did so. Defendant left the house the next day, but this made her mother sad, and he returned a week later, after the victim told her mother it was okay. A month or two later, defendant reminded the victim of what he had said and told her "the offer still stands," and if she "ever wanted an orgasm, to go to him." She did not tell her mother,

3

because her mother loved defendant. There were other violent instances with defendant after that, but nothing else sexual until the instant offenses.

On November 24, 2012 defendant referred to her mother's "jealousy trip," and then made reference to the victim's "skinny jeans" and the sexual comment he had made to her two years before. He said he had had to leave the house earlier while the victim was showering because he fantasized about coming into the shower with her, and said when he was in bed with her mother he sometimes fantasized about the victim, and after saying how beautiful she was, told the victim, "if it was a life sentence for messing with me, he would take it." However, he told her he would only do anything if she allowed it. He then said "if I caught him looking at my buttocks or my vaginal area, not to think of him like a pervert." He said he was not a pedophile, and she was the only girl he felt that way about, and he had had feelings for her since he met her, which was when she was 8 years old or younger. She planned to tell her mother about what happened but did not want to tell anybody else because "I felt dirty."

Later, the victim went home to get a skateboard, after first sending her aunt to get it, without success. Defendant gave her the skateboard and then put his arms around her, referred to what they had been discussing and asked her repeatedly if he could touch her buttocks. His lips were white and cracked and he was jittery, so she thought he was on methamphetamine. When he is on that drug "[h]e gets more violent and there's no stopping him." Finally she asked him if he would let her leave if she let him touch her, and "he told me yeah, so I let him" and he began rubbing her buttocks (count 3, misdemeanor sexual battery). Then he repeatedly said he wanted to touch her breasts. Again, she asked if he would let her go if she allowed him to touch her, and he said he would, then he touched one breast, then pulled it out of her bra and mouthed it, then said he had to do both, so he did the same to her other breast (count 1, felony sexual battery). She "just wanted to leave. I don't like violence. I get tired of it." He then said she had a "pretty little mouth" and wanted to show her how a grown man kissed, and asked for her

4

tongue so he could show her, then he proceeded to kiss her (count 4, misdemeanor child molestation).[2] He kept asking her if she wanted him as badly as he wanted her, and she said no, he was a father figure and it "was just gross." She started to walk to the door, but he put his arms around her again and said her "pussy" was probably "pretty and little and fat" and he wanted to touch it, and he reached out and closed the door partly. She did not scream because "[n]obody was around who was going to hear me." He then touched her vagina under her pants (count 5, felony sexual battery), and although the door was open slightly, she did not call out because she "was stuck, like froze." He told her she had to touch him so he would not be the only one getting in trouble. He had pulled his penis out and she touched it, while he had one arm around her and the other holding his penis (count 2, felony sexual battery). Then he wanted her to put her mouth on it, and she said no, but he said "he wanted me to do it" and she did (count 6, oral copulation by force or fear). Defendant "put . . . my head down there and I just put my mouth on the tip of it and pulled back." He held her while he put his penis in his pants and made her promise not to tell anyone. When her boyfriend called, she was afraid to tell him what had happened for fear he would attack defendant and be arrested for assault, so she said she would be over as soon as she could. Defendant then closed the door all the way when she reached for the doorknob, and "just made me promise that I wouldn't tell" anybody, and asked if it bothered her if he went upstairs and "jack[ed] off" thinking about her. He said he wanted to "spoon" with her the next day her mother was at work.

She left after promising not to tell anybody. She asked a friend if she could stay with her, but did not tell her boyfriend why, again because she was afraid he would attack

_____

2 Although the prosecutor initially elected to base count 4 on lewd kissing, later in argument the prosecutor invited the jury to choose *any* act motivated by an abnormal sexual interest in a child, so long as all 12 jurors agreed on a particular act. We discuss the resulting confusion in Part VI, *post*.

defendant. She called her mother and told her she was sorry because defendant had done it again. Her boyfriend heard the conversation, and as she had predicted, became angry. He and some other youths went back and fought with defendant until police arrived.

The victim was five foot two inches tall, and defendant was about six inches taller. The victim thought he was circumcised, and knew the difference, but "wasn't paying much attention to [his penis] but I saw a darker line on the tip of it."

The defense consisted of two stipulations. First, photographs showed defendant's penis. They appear to show he is uncircumcised, but also show a dark circumferential line, and it does not appear his penis is fully erect. Second, on June 6, 2010, when officers responded to claims defendant made sexual comments, the victim told them: "My mom is upstairs with that mother fucker. I hate her, too. There ain't no way I'm going back there. [¶] I want him out of here. She kicked him out for like a week and now he's back. I hate that mother fucker."

The People argued the victim was credible, and submitted out of fear based on defendant's prior lewd comments and acts of violence. They added her credibility was enhanced by the fact that she did not make the offenses seem worse, such as by claiming defendant used a weapon or made an explicit threat, and because of her demeanor (crying) afterwards. The defense argued the victim hated defendant, and wanted to get rid of him, and pointed out he was uncircumcised, bolstering the view that she lied.

The jury found defendant guilty as charged.

## DISCUSSION

### I

### *Instruction on Custody Status*

Defendant contends an instruction to prospective jurors, which referred to his custody status, undermined the presumption of innocence. We disagree.

The trial court instructed prospective jurors in part as follows:

6

"The defendant is in custody in this matter. While court is in session, a custody officer from the Sacramento Sheriff's Department will be seated by the defendant at all times. You must not consider the presence of a custody officer or the defendant's custody status for any purpose."

First, contrary to defendant's view, the contention of error is forfeited as trial counsel did not object to the instruction and seek empanelment of new prospective jurors to cure any possible harm.[3] Nor does counsel point to any answers of seated jurors that indicated they misunderstood this instruction or any indication that the seated jury misunderstood the post-trial instructions on the People's high burden of proof and the presumption that defendant was innocent.

Defendant cites cases involving defendants appearing before a jury in jail clothing or visibly shackled or gagged. None of those cases are comparable, as here defendant was not visibly restrained, and the record does not show that he appeared in jail clothing. Nor is this a case where multiple officers are near or surrounding the defendant, conveying the impression that the defendant presents a physical danger, nor a case where an officer stands guard while a defendant testifies. (Cf. *People v. Hernandez* (2011) 51 Cal.4th 733, 742-744 (*Hernandez*).) Here, a single officer was seated by defendant, the trial court explained this was a normal procedure, and trial counsel did not view the explanation as prejudicial.

Defendant appears to contend it is impermissible for a trial court to adopt a policy of having a security officer sitting beside a defendant in the courtroom, and must make special findings justifying such practice in each case. We question this proposition. (See *People v. Stevens* (2009) 47 Cal.4th 625, 634 ["we have consistently upheld the

_____

[3] This instruction was not even discussed on the record, much less objected to, and we do not know whether it was discussed during the unreported discussions to which the trial court referred. The better practice is for the court to make *no reference* to a defendant's custody status unless defense counsel requests that reference be made, or it is otherwise necessary. When reference is made by instructing the jury or in any other manner, the court should place its reasons for doing so on the record.

stationing of security or law enforcement officers in the courtroom"]; *People v. Duran* (1976) 16 Cal.3d 282, 291, fn. 8 ["Unless they are present in unreasonable numbers, such presence [of armed guards] need not be justified by the court or the prosecutor"].) But even if we agreed, it is "well settled . . . 'that the use of physical restraints in the trial court cannot be challenged for the first time on appeal.' " (*People v. Ward* (2005) 36 Cal.4th 186, 206.) Had defendant wanted a record of the reasons for the presence of the security officer, he should have objected, and then those reasons could have been placed on the record, or a hearing could have been held if defendant contested the reasons given. Absent a timely objection, we decline to assume the trial court ordered the officer's presence arbitrarily, or assume that the officer's presence caused prejudice, particularly given the trial court's clear admonition to the jury to disregard the officer's presence.

Further, any error would be harmless, as there is no indication the presence of the officer affected the jury's consideration of the evidence and instructions in any way. (See *Hernandez*, *supra*, 51 Cal.4th at pp. 746-748 [requiring that the defendant show actual prejudice where an officer stood by a testifying defendant, absent a record showing need].)

II

*Admission of Uncharged Evidence*

The People moved in limine to admit evidence of the victim's knowledge of certain of defendant's prior arrests and incarcerations for crimes of violence, to bolster her claim that she was fearful of him. The motion referred in particular to arrests for battery in 2008 and 2010 and brandishing a weapon in 2012. At the hearing, the prosecutor clarified that defendant had two battery *convictions* and one *conviction* for brandishing a weapon, not merely arrests. However, she was not sure whether the victim knew about these convictions. After discussion, the People withdrew the motion until they had time to interview the victim.

8

After the interview, the People moved to admit evidence of the occasion in 2010 when defendant offered to teach the victim about orgasms, and said he wanted to engage in cunnilingus with her, and allegedly also said he wanted to have a "threesome" "with her and one of her cousins." The People also sought admission of evidence the victim had witnessed domestic violence, threats, drug use, and property damage by the defendant. This expanded motion was accompanied by a document listing each specific incident the People wanted to introduce.

The trial court largely granted the People's motion, finding some evidence was relevant to show defendant's lewd intent toward the victim, and some was relevant to show the reasonableness of her fear of resisting him, and none of the admitted evidence was unduly inflammatory under Evidence Code section 352.

The bulk of the mother's direct testimony pertained to the uncharged acts, including the drug usage and prior sexual comments defendant does not challenge on appeal. The uncharged evidence, in all its forms, including the prior sexual comments, drug use, and use of knives that defendant does not challenge on appeal, occupied about a third of the victim's testimony. During trial, the court admonished the jury that evidence of domestic violence was not to be considered to show defendant's bad character, but only to show whether or not the victim may have had a reasonable fear of defendant.

During final instructions, the trial court read to the jury the pattern instruction on other crimes evidence (CALCRIM No. 375), but enumerated the specific evidence (acts of violence, use of drugs, and prior sexual comments to the victim), instructed that the People had to prove these acts by a preponderance of the evidence, and then continued with the pattern instructional language as follows:

> "If you decide that defendant committed the uncharged offenses or acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not the victim consented to any sexual touching and/or had a reasonable fear of the defendant on the day of the alleged offenses charged in Counts 1 through 6.

"Do not consider this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is predisposed to commit crime.

"If you conclude that the defendant committed the uncharged offenses or acts, that conclusion is only one factor to consider along with all the other evidence.

"It is not sufficient by itself to prove that the defendant is guilty of the charged crimes. [The] People must still prove every charge beyond a reasonable doubt."

The prosecutor reiterated this point in closing argument.

On appeal, defendant concedes that evidence of prior sexual advances towards the victim and defendant's prior drug use was admissible. He also concedes that testimony by the victim at the preliminary hearing that defendant had pulled knives on her and her mother before would be admissible at trial. However, he contends evidence of further violence revealed during the prosecutor's interview of the victim was "cumulative and inflammatory." We do not agree.

We first observe that although defendant argues the more limited testimony at the preliminary hearing was "ample" to prove the victim's fear and therefore other evidence was not *necessary*, trial counsel did not stipulate the victim's fear was reasonable, and defendant's not guilty plea put all issues in contention. Therefore, the People were free to seek to admit further evidence at trial. (See *People v. Cowan* (2010) 50 Cal.4th 401, 476; *People v. Steele* (2002) 27 Cal.4th 1230, 1243.)

As we have observed before, "[e]vidence is relevant when no matter how weak it is [if] it tends to prove a disputed issue. [Citation.] Evidence may be relevant even though it is cumulative; thus, the only ban on cumulative evidence is found in Evidence Code section 352." (*In re Romeo C*. (1995) 33 Cal.App.4th 1838. 1843.) Our Supreme Court has emphasized that "evidence does not become irrelevant simply because other

10

evidence may establish the same point." (*People v. Smithey* (1999) 20 Cal.4th 936, 973-974.)

More recently, we said "[w]e do not disagree with the basic proposition that *evidence may* have a lower probative value if it is merely cumulative of other evidence [citations] and there is a substantial danger of confusing or misleading the jury or a substantial danger of necessitating an undue consumption of time. [Citation] To be cumulative imports that something of like effect is shown. [Citation.] However, ' "[e]vidence that is identical in subject matter to other evidence should not be excluded as 'cumulative' when it has greater evidentiary weight or probative value." ' " (*People v. Holford* (2012) 203 Cal.App.4th 155, 178, fn. 14 (*Holford*).) Thus the trial court did not abuse its discretion unless it violated Evidence Code section 352.[4]

"The two crucial components of [Evid. Code] section 352 are 'discretion,' because the trial court's resolution of such matters is entitled to deference, and 'undue prejudice,' because the ultimate object of the section 352 weighing process is a fair trial." (*People v. Harris* (1998) 60 Cal.App.4th 727, 736 (*Harris*).) " 'The prejudice which exclusion of evidence under . . . section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.] 'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 958.)

As we recently pointed out: "Evidence is not inadmissible under [Evid. Code] section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights." (*Holford*,

_____

[4] Evidence Code section 352 provides in full: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

*supra*, 203 Cal.App.4th at p. 167.)  Moreover, "[t]rial courts enjoy ' "broad discretion" ' in deciding whether the probability of a substantial danger of prejudice substantially outweighs probative value."  (*Id.* at pp. 167-168.)

In determining whether uncharged act evidence will be unfairly prejudicial, we typically consider:  (1) the probative value of the evidence; (2) the comparatively inflammatory nature of the evidence; (3) the probability of jury confusion about how to use the evidence; (4) remoteness; and (5) consumption of trial time.  (See, e.g., *Harris*, *supra*, 60 Cal.App.4th at pp. 737-741.)  We consider each of these points in turn.

1)  The evidence was highly probative, because, if believed, it showed that the victim had good reason to submit to defendant's sexual advances without protest, for fear of violence against her, particularly because she thought he was on methamphetamine, a circumstance that signaled to the victim that he "gets more violent and there's no stopping him."

2)  The evidence was not *comparatively* inflammatory.  The victim's unchallenged evidence showed defendant had groomed her for sexual predation and that he became violent when on drugs, as she testified he was on this occasion.  The fact multiple instances were admitted would not unduly prejudice the jury.  As we have said, "Painting a person faithfully is not, of itself, unfair."  (*Harris*, *supra*, 60 Cal.App.4th at p. 737.)

3)  We see no reason the jury would misunderstand the trial court's instructions on the proper use of this evidence.

4)  The evidence was not remote, but rather it evinced an ongoing, continuous pattern of violence.

5)  The evidence did not occupy so much of the trial transcript as to dwarf the evidence of the charged sexual offenses, and thereby confuse or mislead the jury.  The victim discussed uncharged acts, including those not challenged on appeal, in approximately a third of her testimony.  That is not presumptively prejudicial.  (See *Harris*, *supra*, 60 Cal.App.4th at p. 739.)

In short, we find no abuse of the trial court's broad discretion to admit this evidence.

## III

### *Denial of Mistrial Motion*

Twice during her testimony, the victim's mother mentioned defendant had been in prison. Each time, the defense counsel objected, the objection was sustained, and the trial court admonished the jury to disregard the answers.

First, when asked if her children knew defendant well before the marriage, the mother said "Um, not really. Little bit. Some. He was in and out of prison before we got married." The defense objected, the mother apologized, the objection was sustained, the answer was stricken, and the jury was admonished to disregard it.

Later, when asked why she had not called the police every time defendant made threats of violence, the mother answered it was because "I didn't want him going back to prison." A defense objection was sustained, the answer was stricken, and the jury was admonished to disregard the statement.

After the prosecutor finished questioning the mother, defense counsel moved for a mistrial. The trial court denied the motion, because it had promptly stricken the answers and admonished the jury to disregard them.

During the instructional conference, the trial court proposed modifying the pattern instruction that directs the jury to disregard stricken testimony. The trial court suggested a paragraph specifying the mother's testimony about "defendant's background," characterizing it as a "pinpoint" instruction, and defense counsel stated: "I believe this to be sufficient and I'm satisfied with what is written here."

The special instruction, as read to the jury along with the pattern instruction on disregarding stricken testimony (CALCRIM No. 104), was as follows:

13

"When [the victim's mother] testified about the defendant's background, the Court struck certain testimony from the record and ordered the jury to disregard that testimony.

"You must not consider that testimony, discuss it or allow it to enter into your deliberations in any way."

On appeal, defendant contends the trial court's admonitions and instruction were not sufficient to "unring the bell" regarding defendant's criminal record, despite trial counsel's view that the special instruction was satisfactory.

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskins* (1982) 30 Cal.3d. 841, 854; quoted with approval in *People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.) Given the prompt admonitions and "pinpoint" instruction, and the ample testimony supporting the charged offenses, we cannot say the trial court abused its discretion by denying the mistrial motion based on two brief references to the fact that at some point defendant spent time in prison.

IV

*Evidence of Oral Copulation*

Defendant next asserts the victim's testimony describing forced oral copulation falls within that rare category of evidence that is inherently improbable and therefore cannot be deemed credible. We disagree.

"We review the whole record in a light most favorable to the judgment to determine whether it contains substantial evidence, i.e., evidence that is credible and of solid value, from which a rational trier of fact could find beyond a reasonable doubt that the accused committed the offense." (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 859.) "Evidence is sufficient to support a conviction only if . . . it ' "reasonably inspires

14

confidence" ' . . . and is 'credible and of solid value.' " (*People v. Raley* (1992) 2 Cal.4th 870, 891.)

Generally, the testimony of a single witness is sufficient to prove even a disputed fact. (See *People v. Barnwell* (2007) 41 Cal.4th 1038, 1052.) However, "[t]he trier of the facts may not believe impossibilities." (*Hicks v. Reis* (1943) 21 Cal.2d 654, 660; see *People v. Ozene* (1972) 27 Cal.App.3d 905, 910.) " 'To warrant the rejection by a reviewing court of statements given by a witness who has been believed by [the fact-finder], there must exist either a physical impossibility that they are true, or it must be such as to shock the moral sense of the court; it must be inherently improbable and such inherent improbability must plainly appear.' " (*People v. Jones* (1970) 10 Cal.App.3d 237, 247.)

In closing argument, defendant emphasized that the victim claimed defendant was circumcised, but that the photographs showed otherwise. In rebuttal, the prosecutor emphasized the victim saw the penis briefly, and argued the depictions of it in the photographs were not as clear-cut as trial counsel argued.

On this record, the jury could rationally believe the victim. She was a 16-year-old girl who testified she did not want to look at defendant's penis, and therefore the fact, if it be a fact, that she was in error about whether or not defendant was circumcised amounts to a mere conflict in the evidence, and does not show that she lacked credibility or that her testimony was impossible or inherently improbable. That the victim may have misperceived whether defendant's penis was circumcised or not was a discrepancy well within the discretion of the jury to resolve, and does not come close to showing that her testimony was legally insufficient.

Defendant urges it is "highly unlikely" that the victim, who had a boyfriend, would not be able to correctly describe defendant's penis. But there was no evidence the victim ever had sex with her boyfriend--or anybody else--or had ever even *seen* her boyfriend's penis, nor whether her boyfriend was circumcised. The victim testified she

15

knew what circumcision was, but tried *not* to look at *defendant's* penis. That she may have been mistaken about the whether he was circumcised does not make her testimony incredible. (See *People v. Troutman* (1921) 187 Cal. 313, 315.)[5]

V

*Custody Credits*

Defendant contends he is entitled to more presentence credits. The People argue that he is entitled to fewer credits. We agree with the People.

Neither party objected to the probation report's discussion of defendant's periods of custody; therefore, we presume the report is accurate as to those matters. (See *People v. Evans* (1983) 141 Cal.App.3d 1019, 1021 (*Evans*).)

The trial court imposed a one-year misdemeanor term on count 3 (§ 243.4, subd. (e)(1)), and applied all of defendant's 104 actual custody days, plus 104 "good-time work-time" credits towards that sentence. It announced defendant would be left "with no additional credits, after you finish the misdemeanor, as you go off to prison."[6]

Section 2933.1 provides in relevant part as follows:

> "(a) Notwithstanding any other law, any person who is convicted of a felony offense listed in subdivision (c) of Section 667.5 shall accrue no more than 15 percent of worktime credit, as defined in Section 2933.
>
> [¶] . . . [¶]

_____

[5] Defendant also argues the victim's testimony regarding defendant's use of force was inconsistent as to this count. It is well-settled that even dramatic inconsistencies in testimony do not render that testimony incredible per se. We leave the duty of evaluating the credibility of witnesses to the jury absent a few exceptional circumstances, none of which is evident from this record.

[6] It is possible that by this comment the trial court meant to suspend execution of the prison sentence until defendant completed his remaining misdemeanor jail term. However, because the parties do not brief this point, we do not need to resolve it.

16

"(c) Notwithstanding Section 4019 or any other provision of law, the maximum credit that may be earned against a period of confinement in, or commitment to, a county jail, . . . following arrest and prior to placement in the custody of the Director of Corrections, shall not exceed 15 percent of the actual period of confinement for any person specified in subdivision (a)."

Defendant does not dispute that he committed a qualifying offense listed in section 667.5, subdivision (c), that is, forcible oral copulation. (See § 667.5, subd. (c)(5).) The trial court gave defendant 104 days of "good-time work-time" credit because these credits were allocated to a county jail sentence, and therefore the trial court did not believe the 15 percent limitation of section 2933.1 applied.

But subdivision (c) of section 2933.1 states the maximum credit defendant could earn against "a period of confinement in, or commitment to, a county jail . . . shall not exceed 15 percent" as to persons convicted of a qualifying offense. When committed to jail on count 3, he was limited to earning 15 percent credits "against" that sentence. (§ 2933.1, subd. (c).) As we have explained in a prior case, "section 2933.1, subdivision (c) limits presentence conduct credits for nonviolent crimes whenever the defendant has suffered a current conviction for a violent felony and the sentences for the two offenses are run consecutively, without regard to the timing of each conviction." (*People v. Marichalar* (2003) 144 Cal.App.4th 1331, 1335.) The trial court imposed a separate consecutive sentence on the misdemeanor.[7] Therefore, defendant was entitled to only 15 days of conduct credit on the sentence for count 3, 15 percent of the 104 actual days he served.

Defendant claims he should have received credit for the day he was arrested, before he was actually booked into jail. By statute, defendant was entitled to credit for time "in custody, including, but not limited to, any time spent in a jail, camp, work

_____

[7] By stating defendant would have no credits left to apply to his prison term, the trial court was necessarily imposing the misdemeanor term and the felony term as consecutive terms.

17

furlough facility . . . or similar residential institution." (§ 2900.5, subd. (a).) The statute does not grant credit for time when a person is merely under arrest and pending booking. (See *People v. Macklem* (2007) 149 Cal.App.4th 674, 702 ["credit for time served commences on the day a defendant is booked into custody"]; *People v. Ravaux* (2006) 142 Cal.App.4th 914, 919-921 [same].) The probation report shows he was placed in jail on November 25, 2012, not November 24, when he was arrested. As there was no objection, we presume the report is accurate. (See *Evans*, *supra*, 141 Cal.App.3d at p. 1021.)

Defendant also contends he should have received credit for periods that, according to the probation report, he was serving sentences in other cases. As the People argue, defendant is not entitled to dual credits. (§ 2900.5, subd. (b); *People v. Gisbert* (2012) 205 Cal.App.4th 277, 281.) From January 5, 2013, to the date of sentencing, April 18, 2013, defendant earned 104 days of actual time *on this case*. Defendant contends the matter must be remanded to clarify the various custody periods, but if he wanted to challenge the probation report, the time to do so was at or before sentencing. (See *Evans*, *supra*, 141 Cal.App.3d at p. 1021.)

The credit award must be modified (§ 1260) to show 104 days of actual credit and 15 days of conduct credit on count 3, for a total of 119 days. An amended abstract must show defendant earned 119 days towards the misdemeanor term in count 3, and zero days towards his prison term.

VI

*Sentence on Count 4*

As the People point out, and defendant does not dispute, the trial court failed to impose any sentence on count 4, misdemeanor child molestation, suggesting the omission was due to the application of section 654. However, the trial court must impose sentence on *all* counts, and then stay that portion necessary to comply with section 654, otherwise

18

the resulting sentence is unauthorized.  (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1469 (*Alford*), approved by *People v. Duff* (2010) 50 Cal.4th 787, 795-796.)

As we noted *ante*, although the People initially elected to base count 4 on lewd kissing, they later abandoned that election.  We shall assume for purposes of expediency that the trial court found count 4 involved the same conduct as that involved in the other misdemeanor count (count 3) for which an unstayed jail sentence of one year was imposed.  Accordingly, to avoid the wasteful expense of a remand (see *Alford*, *supra*, 180 Cal.App.4th at p. 1473), we shall impose a one-year concurrent term on count 4, stayed pursuant to section 654.

## DISPOSITION

The judgment is modified to reflect the change in credits described in this opinion, and to impose and stay a one year concurrent sentence on count 4.  As modified, the judgment is affirmed.  The trial court is directed to prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.


                                              DUARTE              , J.


We concur:


       RAYE              , P. J.


       MURRAY            , J.


19