Filed 2/18/22  P. v. Miles CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>CHRISTOPHER RAY MILES,<br><br>    Defendant and Appellant. | C092292<br><br>(Super. Ct. No. 19CF05982 &<br>19CF07587) |

Defendant, Christopher Ray Miles, moved to exclude a video of him confessing to ownership of an eyedropper bottle containing heroin.  He claims the correctional deputy obtained his confession in violation of his *Miranda*[1] rights.  After the trial court denied his motion to suppress his confession, the jury found defendant guilty of possessing a controlled substance in a custodial facility.  On appeal, defendant claims the trial court

---

[1]  *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

1

erred when it denied his motion. Defendant also argues the trial court erred in ordering restitution in this case based on his actions in a second dismissed case because the trial court never obtained a valid *Harvey*[2] waiver from him when it dismissed that case. We shall strike the restitution order and affirm the judgment.

FACTS AND PROCEDURE

*Facts Relevant to Grand Theft Case* (*Case No. 19CF05982*)

Defendant ripped phone lines down by hooking them to his vehicle and driving down the road. He loaded the wire from the phone lines into the trunk of his vehicle and drove away. Butte County Sherriff's Officers found 60 feet of wire in his trunk. Officers also found gloves and bolt cutters. An AT&T representative estimated the cost of the wire was over $1,000.

Defendant was charged with grand theft of personal property (Pen. Code, § 487, subd.(a))[3] and vandalism causing over $400 in damage (§ 594, sub. (a)(2)). Defendant pleaded no contest to the charge of grand theft and the vandalism count was dismissed with a *Harvey* waiver (§ 487, subd. (g).). This entire case was ultimately dismissed upon the prosecution's motion with a *Harvey* waiver. The trial court, however, did not take a *Harvey* waiver from the defendant.

*Facts Relevant to Possession Case* (*Case No.* 19CF07587)

Defendant was incarcerated in the Butte County Jail in a cell with Robert Kongle. On September 19, 2019, Correctional Deputy Dylan Pannell entered their cell, ordered them to place their hands behind their back, put them in handcuffs and escorted them from the cell. Correctional Deputy Pannell secured the cell and conducted a visual strip search of defendant and found nothing. After he searched defendant, Correctional

---

[2] *People v. Harvey* (1979) 25 Cal.3d 754 *(Harvey)*

[3] Undesignated statutory references are to the Penal Code.

2

Deputy Pannell secured him in an interview room. Other correctional staff searched Kongle and found nothing.

Correctional Deputy Pannell returned to the cell and searched the two drawers in the cell. Neither drawer had a name tag nor a number assignment on the outside. The drawers are not assigned by the facility. The first drawer contained legal mail and commissary documents labeled for Kongle. It contained nothing with defendant's name on it. Based on this, and because Kongle had no other place to put his belongings, Correctional Deputy Pannell concluded this first drawer belonged to Kongle.

The second drawer contained an eyedropper bottle and no other items of note. The contents of the eyedropper bottle presumptively tested positive for heroin. At trial, Correctional Deputy Pannell testified he did not recall any specific other items in the second drawer or anything with defendant's name on it.

Correctional Deputy Pannell testified inmates do not often put things in other inmate's drawers. Based on the location of the eyedropper bottle, the items in the first drawer with Kongle's name on them, and the deputy's knowledge of prison politics, Correctional Deputy Pannell concluded the eyedropper bottle belonged to defendant.

After the search, Correctional Deputy Pannell took a 10-second video of his interaction with the defendant on his body camera. Correctional Deputy Pannell held up the eyedropper bottle in his hand and asked defendant, "Seen this before?" Defendant nodded in the affirmative. Correctional Deputy Pannell asked, "Is it yours?" Defendant again nodded in the affirmative.

The jury found defendant guilty of possession of a controlled substance or paraphernalia in a custodial facility. The trial court sentenced defendant to six years in state prison. Over defendant's objection, the court imposed restitution in the amount of $1,465.48 in favor of AT&T for the stolen wire in the dismissed case.

3

*Motion to Suppress*

Prior to trial, Defendant moved to suppress the contents of two videos taken of him by Correctional Deputy Pannell. The trial court reviewed the two videos. The trial court also presided over the preliminary hearing in this case, which was the only evidence available to the court at the time defendant made the motion.

At the preliminary hearing, Correctional Deputy Pannell testified consistent with his trial testimony that he removed defendant and Kongle from their cell and discovered nothing upon searching them. During his search of their cell, Correctional Deputy Pannell found the eyedropper bottle in what he concluded was defendant's drawer.

Correctional Deputy Pannell initially testified at the preliminary hearing he gave defendant *Miranda* warnings before he interviewed him. On cross-examination, however, he testified, "I Mirandized him. He stated he knew his Miranda, that he's been read his Miranda multiple times." Correctional Deputy Pannell alternatively testified, he was not sure he gave defendant *Miranda* rights, he did not recall whether he gave them, but his report reflected what he remembered. His report stated he had asked defendant if he had been read his *Miranda* rights and understood them.[4]

Following this search, Correctional Deputy Pannell engaged in a discussion with defendant which was recorded on his body camera. That video is approximately one minute and 48 seconds long and was not presented to the jury. That video shows the following interaction:

"[Correctional Deputy Pannell]: Do you understand them?

"Do I need to read them to you for you to understand them or do you have a basic understanding of them?

"[Defendant]: I have an understanding.

---

[4] At trial, Correctional Deputy Pannell testified he believed he gave defendant his *Miranda* rights, but not verbatim.

"[Correctional Deputy Pannell]:  Alright.  Um .  Do you want to know why I am talking to you all official like?

"[Defendant]:  (unintelligible) . . . Yea.

"[Correctional Deputy Pannell]:  So when you came in we talked, we did your little classification interview.  We talked about detoxing a little bit.  Um, so far you haven't been detoxing so that's a good sign.  Right?

"Um, the reason for that is because you brought in a controlled substance into the facility.  Earlier you stated you don't know Gregory Sterling but he put money on your books.  Multiple inmates who have been trying to get you money have been talking on the phones.  Talking about buying heroin from you.  We already found heroin in D pod.  Um, so you know what I mean.

"It's . . . if there is more . . . if there is more to the story feel free to clue me in but as of right now everyone is kind of pointing at you but you're also from another county so maybe it's because you're from another area.

"[Defendant]:  I tried to bail out, but I don't know.

"[Correctional Deputy Pannell]:  You have the money or are you trying to put it together?

"[Defendant]:  I'm trying to put it together.

"[Correctional Deputy Pannell]:  That's a good way to do it.  Um, just . . . are you done now?  Is it . . . is it gone?  Are we good? Or . . . .

"[Defendant]:  Pshh . . . um . . . we are good.

"[Correctional Deputy Pannell]:  How much did you bring in?  Allegedly, a gross number?  What are you working with?

"[Defendant]:  I'd rather not say nothing that way no one gets their feelings hurt.

"[Correctional Deputy Pannell]:  More than we expect though from what I hear.

"[Defendant]:  What'd you expect?

"[Correctional Deputy Pannell]:  (Unintelligible).

5

"[Defendant]: (Unintelligible).

"[Correctional Deputy Pannell]: Alright [defendant], you're good my man."

During this conversation, defendant was fully dressed, sitting casually on a bench, and otherwise unrestrained. He slouched against one wall of a small room with his legs sprawled out. He was looking to his right at Correctional Deputy Pannell. The back of the room appeared to be a few feet to his left and the wall in front of him appears several feet away. Defendant has one arm folded across his chest with his other hand up to his chin.

Shortly after they completed this conversation, Correctional Deputy Pannell filmed the second, 10-second interaction with the defendant on his body camera that was played to the jury. This short video contained defendant's confession of ownership. The time stamp on this video shows it starts approximately 20 seconds after the first encounter ended.

In the second video, Correctional Deputy Pannell appears at one end of a wide hallway and defendant is at the other end. Defendant is holding a tray in one hand and has his other hand behind his back. There are three other correctional deputies present. The second correctional deputy is standing near Correctional Deputy Pannell holding a water bottle and idly observing the scene. A third correctional deputy is standing a few feet behind the defendant on the other side of a cart of boxes from him and with one hand in his pocket. A fourth correctional deputy is standing to the left of defendant holding the door handle to a door labeled with the letter "C" on it.

In his motion, defendant argued he was not properly read his *Miranda* advisement prior to the first interrogation, and he invoked his right to remain silent when he replied to Correctional Deputy Pannell: "I'd rather not say nothing that way no one gets their feelings hurt." Defendant asserted the trial court should have excluded the second statement because it was obtained after he invoked his right to remain silent.

6

The trial court recited a tentative ruling as to the longer video as follows: "I do not believe given the total circumstances, totality of the circumstances, that the Miranda advisement was needed; however, I don't find anything in that video is relevant to the extent that would be admissible: Talks about [defendant] detoxing, his intake sheet, about using heroin, talks about selling it. I don't also see any real admission by him. There are certain statements that [Correctional] Deputy Pannell makes that he doesn't necessarily argue with but also doesn't necessarily admit. And to the extent that anything is relevant, I do feel the prejudice would outweigh the probative value." The trial court stated it was inclined to admit the shorter video into evidence. After argument on the motion, the trial court adopted its tentative ruling. The 10-second video was played for the jury.

## DISCUSSION

### I

### *Exclusion of the Video*

Defendant argues the trial court should not have admitted the 10-second video confession depicting him acknowledging his ownership of the eyedropper bottle of heroin into evidence because Correctional Deputy Pannell obtained it from him after he invoked his right to remain silent. We disagree.

A. *Standard of Review*

In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1105.)

The self-incrimination clause of the Fifth Amendment provides that no "person . . . shall be compelled in any criminal case to be a witness against himself." (U.S. Const., 5th Amend.) To protect a suspect's right against self-incrimination, the United

States Supreme Court held in *Miranda, supra*, 384 U.S. at p. 444 [16 L.Ed.2d at p. 706], "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The suspect must be advised, "that he has the right to remain silent, that his statements can be used against him and that he has a right to consult with or have an attorney present. (*Miranda,* at pp. 467-471 [16 L.Ed.2d at pp. 719-722.])" (*People v. Fradiue* (2000) 80 Cal.App.4th 15, 19 (*Fradiue*).)

The evidence whether Correctional Deputy Pannell provided defendant with the requisite *Miranda* warnings or merely asked if he understood those rights is conflicting. On the one hand, Correctional Deputy Pannell's direct testimony would be substantial evidence to support a finding by the trial court at the time of the first video, Correctional Deputy Pannell gave the required *Miranda* warnings. On the other hand, his testimony on cross-examination would be substantial evidence to support a finding that Correctional Deputy Pannell only asked defendant if he knew his rights and the defendant responded in the affirmative. The trial court found no *Miranda* warning was required without specifying why it made that finding.

The Attorney General does not argue Correctional Deputy Pannell gave defendant appropriate *Miranda* warnings, what the effect of confirming a defendant knows his rights means in this circumstance, or whether there was a waiver in this case. Instead, the Attorney General argues defendant's invocation of the right to remain silent was ambiguous, defendant was not in *Miranda* custody during the 10-second video, and any error in the admission of this video was harmless. Given our conclusions, *post,* that (1) the trial court admitted no evidence from the first custodial conversation, (2) defendant did not unequivocally invoke the right to remain silent at any time; and

8

(3) defendant was not in custody when the incriminating admission was obtained, we need not resolve the issue of whether Correctional Deputy Pannell gave defendant appropriate warnings.

### B. Custodial Interrogation

Because the *Miranda* rule applies only "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning," (*Miranda, supra*, 384 U.S. at p. 478 [16 L.Ed.2d at p. 726], we start our analysis with whether defendant was in custody at the time he made his confessions.

The requirement for *Miranda* warnings was extended to prison inmates by *Mathis v. United States* (1968) 391 U.S. 1, 4-5, [20 L.Ed.2d 381, 385]. (*Fradiue, supra*, 80 Cal.App.4th at p. 19.) Whether an inmate's interrogation is "custodial" for purposes of *Miranda* requires a different analysis because, by definition, inmates are already confined in prison. (*Id.* at p. 20.) To determine whether an inmate is in custody, the relevant question is whether some extra degree of restraint was imposed upon the inmate to force the inmate to participate in the interrogation. (*Ibid.*) The court must consider the totality of the circumstances in determining whether prison officials have applied an additional restraint, further restricted an inmate's freedom, and triggered the requirement to provide *Miranda* warnings. (*Id.* at p. 21.) We look to four factors to determine whether an interrogation with an inmate is custodial: "(1) the language used to summon the inmate for questioning, (2) the physical surroundings of the interrogation, (3) the extent to which the inmate is confronted with evidence of his guilt, and (4) the additional pressure exerted to detain him." (*Id.* at p. 20.)

In *Fradiue,* the incarcerated defendant was questioned by a correctional officer in an administrative investigation as to whether drugs found in his cell belonged to him. (*Fradiue, supra*, 80 Cal.App.4th at p. 18.) The defendant had the opportunity to exercise a peremptory challenge to disqualify the first investigator assigned to this matter. (*Id.* at

9

pp. 17-18.) The correctional officer went to the defendant's cell and stood in front of it. (*Id.* at p. 19.) Defendant squatted or sat just inside the cell door. (*Id.* at p. 18) The correctional officer informed defendant of his right to exercise a peremptory challenge. (*Ibid.*) During the following thirty-minute conversation, defendant admitted he possessed the drugs. (*Ibid.*) In rejecting defendant's argument his confession must be suppressed because had been obtained without first reading him his *Miranda* warnings, the court noted the defendant had not been summoned anywhere but was questioned in his cell. (*Id.* at p. 20.) His cellmate was also present at the time. (*Id.* at pp. 20-21.) Defendant was not handcuffed or otherwise restrained. (*Id.* at p. 21.) He was told he was free to reject the investigator. (*Ibid.*)

Further, defendant acknowledged he was free to walk away from the investigator and he was not confronted with any evidence of his guilt when he made his confession. (*Fradiue, supra*, 80 Cal.App.4th at p. 21) Under the totality of these circumstances, the court concluded "no restraints were placed upon defendant to coerce him into participating in the interrogation over and above those normally associated with his inmate status" and thus no *Miranda* warnings were required. (*Ibid.*)

In *People v. Macklem* (2007) 149 Cal.App.4th 674 (*Macklem*), the court noted the focus of *Miranda* is "the coercive forces that may affect interactions between a suspect and an interrogating official." (*Id.* at p. 691.) The *Macklem* court phrased the relevant questions of whether an inmate is in custody for purposes of *Miranda* as follows: " '[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' [Citation.] This is determined on the totality of the circumstances surrounding the alleged interrogation, to decide if prison officials applied additional restraints that further restricted [the inmate's] freedom, thereby triggering *Miranda* warning obligations." (*Id.* at p. 695.)

In *Macklem*, a detective went to interview defendant at the prison where defendant was housed for a murder. (*Macklem, supra*, 149 Cal.App.4th at p. 682.) When she arrived at the facility, she asked to speak with the defendant about an assault that occurred at the prison. (*Ibid.*) Prison officials called defendant in his cell to see if he wanted to talk to the detective. (*Id.* at p. 688.) Defendant was brought into an interview room (normally used for attorney and physician conferences) to meet with the detective and his handcuffs were removed. (*Ibid.*) The door to the room was left ajar. (*Ibid.*) The detective identified herself and told him she wanted to talk about the assault case she was investigating. (*Ibid.*) She told him he was not required to talk to her and if he wanted to leave at any time, she would leave the room and lock the door and he would be taken back to his housing unit. (*Ibid.*) During that conversation, defendant made incriminating statements about the murder. (*Ibid.*) The court concluded defendant was not in custody for purposes of *Miranda* and, thus, *Miranda*'s protections did not apply to him. (*Id.* at p. 696.)

Here, we must analyze two separate interrogations. In the first, defendant was not invited to a meeting he was entitled to refuse. Instead, the correctional deputy removed him from his cell, visually strip searched him, and then placed him in a small interview room. The only way out of the interview room was through Correctional Deputy Pannell while he was interrogating him. Correctional Deputy Pannell confronted defendant with the evidence of his guilt in this first meeting. Contrasted with these factors demonstrating defendant was subject to restraint above and beyond normal prison conditions, only one of the relevant factors weighs against this determination. In the short conversation, defendant was not handcuffed or otherwise restrained. Based on the totality of the circumstances, we conclude defendant was subjected to additional restraints that further restricted his freedom above and beyond what a normal inmate experiences in jail during this first meeting. A reasonable inmate under these

11

circumstances would not feel free to leave the interrogation. As a result, during this first interrogation, defendant was in custody for purposes of *Miranda*.

The circumstances surrounding the second interrogation, however, were markedly different and indicate he was not in custody. During the second interaction, defendant was not compelled to meet with Correctional Deputy Pannell. Instead, defendant was standing down the hallway from the Correctional Deputy and headed back to his cell. While other deputies were present, none was exerting any type of restraint or showing any intimidation towards defendant. The correctional deputies were casually standing around watching the scene unfold and physically separate from where defendant stood. Defendant held a tray in his hand (presumably his lunch) and immediately after affirmatively answering the two quick questions, he turned to go back towards what appears to be his residence in cellblock C. Correctional Deputy Pannell applied no undue pressure or intimidation himself in this second interaction. Defendant was free to ignore his questions and not respond, but instead nodded his head admitting he had been caught. Under these circumstances, we conclude the second interrogation was not custodial.

*C. Unambiguous Assertion of the Right to Remain Silent*

Defendant contends even without a proper advisement of his *Miranda* rights; he invoked his right to silence during the first video and Correctional Deputy Pannell should have scrupulously honored his right by ceasing all questioning of him. We conclude defendant failed to unambiguously invoke his right to remain silent.

To invoke the Fifth Amendment privilege, and to halt police questioning after it has begun, the suspect "must *unambiguously*" assert his right to remain silent. (*People v. Stitely* (2005) 35 Cal.4th 514, 535.) The determination as to whether a defendant has unambiguously invoked their right requires us to determine whether a reasonable police officer would interpret the statement as one made to terminate the interrogation. (*People v. Williams* (2010) 49 Cal.4th 405, 434.)

12

Generally, a "no" response to a simple question whether the suspect wishes to speak with law enforcement constitutes an unambiguous invocation of the right remain silent. (*People v. Flores* (2020) 9 Cal.5th 371, 418.) Where the question asked, or the answer given is complex, uncertain, or confusing, however, context matters. (*Ibid.*) In those cases, officers may ask a limited number of follow up questions to render more apparent the true intent of the defendant. (*Ibid.*) In *Flores,* the police asked defendant a long, complex, and ambiguous question about whether the defendant "wanted to talk a little bit" about the case or how the police officers were called out to the crime. (*Id.* at p. 415) The defendant first responded "no" or "nah." (*Ibid.*) The officer followed up with a further question if he wanted to share about how they got called out, reminding the defendant he did not have to answer any questions, and that he wanted to talk to the defendant about things like his name and birthdate, and things like that. (*Id.* at pp. 415-416.) In response to whether he wanted to talk about that, the defendant said "yeah, well whatever." (*Id.* at p. 416.) The defendant then made admissions in that conversation about how he committed the murder. (*Ibid.*) Our Supreme Court concluded the follow up question was a permissible attempt to clarify the defendant's intent given the inherent ambiguity in the officer's original question and answer. (*Id.* at p. 419.)

Here, defendant said, "I'd rather not say nothing that way no one gets their feelings hurt," in response to the questions: "How much [heroin] did you bring in? Allegedly a gross number. What are you working with?" Based on our review of the video and the totality of the circumstances, we conclude this was not an unambiguous assertion of the right to remain silent. Defendant's statement could be taken a couple ways. It could have expressed his desire not to talk at all, or more likely, simply a statement he did not want to talk about the amount of heroin he brought into the jail in response to the specific questions asked of him on that subject.

In terms of context, the relevant statement was made during a short two-minute conversation, not during a long exhausting conversation filled with potentially coercive

13

law enforcement inquiries.  At the beginning of the conversation, defendant affirmatively agreed he wanted to know why Correctional Deputy Pannell was there.  It was not until Correctional Deputy Pannell told him why and asked him the quantity of drugs defendant had brought into the prison, that defendant responded he "would rather not say nothing."

The nature of the defendant's response after his statement invited further clarification and cuts against a finding defendant unambiguously expressed his intent to remain silent.  When Correctional Deputy Pannell followed up defendant's answer by telling him he had brought more heroin into jail than the deputy expected, defendant responded by asking, "What'd you expect?  Rather than remaining silent, defendant continued the conversation as though it was not over.  Thus, we conclude defendant did not unambiguously invoke his right to remain silent.

While defendant was in custody for purposes of *Miranda* during the original interrogation, he did not unambiguously invoke his right to remain silent.  Although the evidence does not support the contention defendant was given the required full recitation of rights under *Miranda*, nothing he said in that first conversation was used against him at trial.  Thus, we conclude there was no violation of the *Miranda* rule related to this discussion.

After the first interrogation was completed, correctional deputies released defendant back to his jail living quarters and gave him his lunch.  It was then that Correctional Deputy Pannell asked two more questions just before defendant ducked into the door labeled "C".  At this time, defendant was no longer in custody, but was free to head back to his cell with his lunch.  His demeanor and the nature of the conversation demonstrated defendant believed he was free to go, as he did so he nodded yes to the second question.  "Absent 'custodial interrogation,' *Miranda* simply does not come into play." (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)  Because defendant was not in custody for purposes of *Miranda* when this confession was obtained, there was no violation of his rights when it was presented to the jury.

14

*D. Restitution*

In his supplemental briefing, defendant argues the trial court erred in ordering him to pay restitution because the trial court could not consider the facts of the dismissed action. The Attorney General concedes. We accept the Attorney General's concession.

In *Harvey,* our Supreme Court held the trial court could not consider any of the facts underlying dismissed counts because, absent an agreement to the contrary, a plea bargain implicitly includes the understanding the defendant will not suffer any adverse sentencing consequences by reason of the facts underlying the dismissed counts. This rule applies to restitution. "When a court imposes a prison sentence following trial, section 1202.4 limits the scope of victim restitution to losses caused by the criminal conduct for which the defendant sustained the conviction." (*People v. Woods* (2008) 161 Cal.App.4th 1045, 1050.)

"To avoid the *Harvey* restriction, prosecutors often 'condition[] their plea bargains upon the defendant agreeing that the sentencing court may consider the facts underlying the not-proved or dismissed counts when sentencing on the remainder.' [Citation.] Defendants may accept this relatively minor potential consequence in order to avoid other convictions or sentencing enhancement terms. [Citation.] This agreement is known as a '*Harvey* waiver.' [Citation.] A *Harvey* waiver permits the sentencing court to consider the facts underlying dismissed counts and enhancements when determining the appropriate disposition for the offense or offenses of which the defendant stands convicted." (*People v. Munoz* (2007) 155 Cal.App.4th 160, 167.)

Here, when the trial court dismissed the first case (case No. 19CF05982) during the sentencing proceedings for both cases, the trial court granted what the prosecutor proffered as a motion to dismiss the first case with a *Harvey* waiver. The trial court, however, did not obtain a *Harvey* waiver from defendant, nor does one appear in writing in the record. Without a waiver from defendant that the trial court could consider the dismissed charges in sentencing defendant, the trial court erred in imposing restitution.

15

## DISPOSITION

The order of restitution in the amount of $1,465.48 in favor of AT&T is stricken. In all other respects, the judgment is affirmed.

_____\s_____,
BLEASE, Acting P. J.

We concur:

_____\s_____,
MAURO, J.

_____\s_____,
RENNER, J.

16